I'm curious, have counsel for Musselman and Marable worked out any way of splitting up the arguments? Your Honor, what I would like to do is, since several of the causes of action have overlapping arguments, I would like them to be heard at the same time. And what I would like to do is go 10 and 10, so basically 20, and I may not need all of the second 20 minutes. Okay. Well, wait a minute, you're talking about both Marable and Musselman? Yes, I am. Together? Yes. Okay. Thank you. Okay, let's go ahead with Musselman. I know they overlap, and we'll see. You may not need all that for repeating the same things in Marable. You have both Musselman and Newman. Is that right? Musselman and Newman is the first case, and Marable is the second. Yes, Your Honor. May it please the Court, Sean Hart representing Mr. Musselman and Mr. Marable or Mr. Musselman and Mr. Newman. There are a number of issues here. Musselman is the one that got a jury trial, right? They both got it. Yes, that's correct, Your Honor. I thought Marable, the whole thing went off on summary judgment. Musselman, part of it did, and it got a jury trial on the rest. Have I got that wrong? No, you've got that correct. Marable did not get any trial at all. One thing I would like to do, Your Honor, is just walk through the key issues, and these are actually the ones that overlap, but I think they're the key issues in both cases. And if the Court has any questions along the way, just feel free to stop me. And I understand the procedural motion that was initially brought by the State or the State's attorneys representing Mr. Marable. I understand that just applies to Mr. Marable. Your motion? Counsel, let me ask a question here. I don't understand the whistleblower theory because, as far as I can tell, the record demonstrates that Musselman did not contact the State. Well, Your Honor, if you – when you look at that statute – Is that accurate? He did not contact the State auditor? He contacted several people, and I believe he did not actually contact the State auditor. Doesn't that knock him out of a whistleblower claim? Well – The State statute. The State statute, it's a touch vague on that point because it also talks about challenging rules. And with respect to whistleblowing, in this case, Mr. Musselman was challenging the rules that were allowing the alleged pay padding. So I don't believe it does. I thought the State statute required somebody communicating with the auditor, but I'll take another look at it. Not solely. And it's a little bit confusing because the 210 section in the other statute, kind of the statute that gets you into the second chapter, that discusses actions against supervisors. I'm missing something. Is that about the WLAD then? Yes, Your Honor. Okay. But going back just to the whistleblower statute, is there anything in it that talks about communications other than to the auditor? Yes, Your Honor. There are a couple points. The briefs in this case are rather voluminous because there are several issues. I don't know the site off the top of my head, but it talks about communications with the auditor and the challenging of rules. And in this case, actually, Mr. Musselman and, well, not Mr. Newman, just Mr. Musselman and Mr. Mirabal, they both challenged the rules that were allowing the pay padding to occur. I didn't understand that. I thought they were just challenging the corruption of their superiors and the pay padding. And you're saying this falls within subsection 8B, an employee who in good faith identifies rules. But I didn't understand what rule. There was no rule that allowed the pay padding, I don't think. Well, Your Honor, the way that the state fairs works is, you see, they establish this program called special projects. And under special projects, they could, in fact, Mr. Musselman or Mr. Nishman could designate a special project under the rules that he had set up. And then the senior state ferry management could bill as much as they wanted to, I guess under a separate. I'm not making myself clear. If you can identify a rule and show where Musselman identified the rule or provided information to the Rules Review Committee, then I can understand your argument that under subsection B, he doesn't have to have contacted the state auditor. But I'm not clear on where he identified a rule or provided information to the Rules Review Committee. Well, Your Honor, in Mr. Musselman's declaration, he specifically stated at the Loudermill hearing that he was challenging the special projects program. And he stated to Nishman that he believed that was the basis behind the harassment against him and also the charges that resulted in his dismissal. Well, now, did he take his complaints to the Rules Committee? Well, in this situation, there really wasn't a Rules Committee because it was Nishman who set up this program. And even worse, he set up a program to keep it secret. And Nishman called his program the controlled document policy. Well, this may all have been terrible, bad stuff that he was doing, but we're looking procedurally at what your client did. And did he go to the Rules Committee? No, he did not. He complained to various persons about the rules. And, in fact, he complained to the Bremerton Sun. And he complained at union meetings. And, in fact, he stood up at union committee meetings and he was identified by the management who was not only the management of the state ferries, but they were also members of the union. So I guess you have to persuade us that he can, under the laws of the State of Washington, be designated a whistleblower. Yes, Your Honor. And it starts with Chapter 4960. And that chapter states that it's to be liberally construed. And in this case, since the person who was the, for lack of a better word, the kingpin of the special projects, they were his rules, he's the one that used the funds. He's the one that doled out the money and he's the one that kept it secret. Isn't there something that says what a rule is? I mean, not anything that some crook does in state government is by virtue of his doing it a rule. There must be something that says what a rule is. I didn't see anything, Your Honor, because I think that both 4960 and the whistleblower, Chapter 4240. I mean, it sounds as though what you're saying is that you don't have to go to the auditor if you're complaining about a rule. And any kind of complaining you do to anybody about a project is equivalent to complaining about a rule. And any complaining you do to anybody is equivalent to complaining to the Rules Committee. And that seems like a lot of jumps. Maybe I don't understand the argument. I don't know. Well, Your Honor, that's a valid concern if the rule is some minor rule that comes up and lasts for a short amount of time, but these special projects had lasted a very long time. And the person who wrote the rules was keeping them secret. I can't see that it's a rule. It looks to me like it's corruption. Special project here for nothing but taking money to do nothing. So you go to the state auditor. Well, see, one thing that, besides the controlled document policy, there was also an auditor's office inside the Department of Transportation. And every time an issue would come up, the DOT itself would send down somebody and then they would say it was resolved, kind of to keep it in-house. So, in fact, that's who Mr. Marable spoke to. And he didn't even know that he wasn't speaking with somebody from the state auditor. He thought when the person initially identified themselves as an auditor, so he described what was going on with the pay padding. As to Musselman, tell us exactly what issues were allowed to go to trial and tell us what was wrong with that trial. Just prior to it going to the jury, Carl Allen was ---- I believe it was the retaliation by Carl Allen against Mr. Musselman. And I believe the other one with Mr. Musselman was Mark Nitchman on First Amendment issues. Okay. And what's wrong with it is Rule 26 requires an expert report to be given for all experts. And also, when a party submits interrogatories to the other side, as I did, in fact, I submitted three sets, I requested all documents related to Mr. Musselman. Why are Musselman's doctor's reports in the ferry's files? Why are those expert opinions? Because ---- They're not the defendant's experts. They're Musselman's doctors, as I understood it. And the ferry has a file on them. Well, these are not experts that Mr. Musselman saw, but he was referred to by the state ferries. And then the state ferries retained documents. Also, even more important, is the document that was withheld through the entire year-and-a-half case. Now, did you propound an interrogatory or request for information that should have elicited these? Yes, Your Honor. Well, how is that if Musselman didn't? They weren't Musselman's documents. They were the ferry's documents, right? That's correct. Is that correct? Most of them, they look to me like, well, what they are is to whom it may concern handwritten notes from a doctor saying that Musselman needs an extended medical leave of absence. They have the form of what a person gets from their doctor in order to show their employer to justify a medical leave. These weren't given to Musselman to take to work and give to his boss? Some of them were, Your Honor. If they were given to Musselman, then he knew about them and could not have been surprised by there being medical leave records in the file. I mean, if the doctor gives him a slip so he can get leave, and then he gives it to his boss and takes leave, he can't very well be surprised. The leave document is not the key document. This is Exhibit 4, Excerpts of the Record, page 237. And this was one of the documents that was withheld. And in this document, it was withheld until last week. Counsel, I still have a question with your saying they're withheld. You're saying withheld by the defendants, right? That's correct. The defendants are henchmen, et cetera, executives. But I thought it was the ferry system that had the document, not as Washington State ferries, not Mr. Mitchman. These are theó Yes, Your Honor. Did the defendants have control or custody of these documents? They did because their attorneys had them. The attorneys for Mitchman had these. Well, they might have them, but that doesn't mean they're a document of Mitchman, does it? Yes, it does. Okay. Under what definition of your request? Under the request, identify all documents related to Mr. Musselman and provide a copy. And the attorneys for Mitchman, we believe they may have been the only persons who had this document. And this document was very prejudicial because it lists doctors' opinions of a doctor that doesn't exist, Mr. Perkins, also it's gotóit just has so many prejudicial statements here, such as a statementóand, by the way, Mr. Mitchman claims he doesn't know who even wrote this. He withheld to the last hour of trial, claims he doesn't know who wrote it, and then it's got statements like Mr. Musselman is making telephone calls to his dog. And, you know, that'só There's a whole lot of stuff in here. It's in fine print. Like, doctor recommends leave of absence for medical reasons. I can't tell whetheróis this just the ferry's log of accommodations they made for Musselman, or is it something else? What is it? I don't know. I've never gotten an answer on what it is. We did no discovery on it because we got it in the last hour of trial. Well, in order for it to come into evidence, there would have had to have been some sort of foundation to show what it was. I objected. It's in the record. What did they say? Under the business records exception? I thinkóI think that's what it came in. You challenged that, but that's how it came in, that it was a record maintained by the Washington State Ferries and the Ordinary Course of Business. I think that's how theóMr. Mitchman's attorneys got it in, Your Honor. So is that incorrect as a matter of law? Was this document not maintained by the Ferries and the Ordinary Course of Business? We don't know. We didn't even know this document existed until the last hour of trial, so we don't know whoó in fact, even the State Ferries or the attorneys for Mr. Mitchman claim they don't know who wrote these statements. Plus, as I saidó Well, that doesn't make it not a business record. In a large business, you're likely to haveówell, like a federal court clerk's office, you're likely to have a lot of deputies who write entries in the docket sheet. Yes, Your Honor. I agree. That's whatóthis looks kind of like a docket sheet, but I don't know if it is. I don't know the context of how it came in. Well, counsel, are you going to devote any argument to Mr. Newman's case? Yes, Your Honor. In Mr. Newman's case, you know, basically we've got the classic threat whenóyou see, Mr. Newman was at NOAA, and Mr. Newman was an expert with engines. He had been an oiler for quite a long time and had even been an independent engineer on a private vessel. So when he came over to the ferries, he had heard about the study of oils, the Oil Study Special Project, a project that had been handed around among the senior officials of the State Ferries for quite a while. And so Mr. Newman asked, what's this Oil Study Special Project? I'm interested. It's my area. And after asking some questions, he learned that this study of the effects of these different oils was going on on his ferry. He saw no special equipment, noónothing other than ordinary maintenance. And so he asked a couple more questions. Well, what exactly is being done and, you know, what's this special project all about? And at one point, Mr. Broxson stated that they were going to be working in the tool room that night. And once in the tool room, Mr. Broxson threatened Mr. Newman by stating that if he didn't stop talking about special projects, something will happen to him, something will happen to his family, or his house will get burned down. Now, that's Mr. Newman's statement. Mr. Broxson, the State Ferries had a member of the management go look into this, and Mr. Broxson stated to that official that he wasn't threatening Mr. Newman. He was threatening another whistleblower, Floyd McLaughlin. He was just saying that, you know, things can happen to people and their house can get burned down. This is admission from Mr. Broxson. And so in response to Your Honor's question, one issue for the appeal, Section C of the brief, is Mr. Newman brought an outrage cause of action. And the attorneys for Mr. Broxson argued the Hobry case. And the outrage claim was dismissed on summary judgment. And in response to that, I argued it was four State's criminal cases, and Hobry was a Division I court of appeals case. So four of a higher precedential value should have carried the day, but the court decided to dismiss the cause of action under Hobry, and Hobry actually had been overruled. And also Hobry applies to Mr. Marable, too. Roberts. Counsel, you've gone through your whole 20 minutes, but you've got another argument coming. Yes. You might want to wind it up now, and since the issues are going to overlap a lot, use part of your Marable time to Yes, I'd like to stop right here then and let the opposing counsel have their say. Thank you, counsel. May it please the Court. My name is Catherine Hendricks, and I'm here this afternoon on behalf of Mark Nichman, Ben Broxson, and Carl Allen. Could you help me on something? Pardon me, Your Honor? Could you help me on something? I would be happy to do so. We've got this affidavit of Bob Newman, and he's a plaintiff, too, not just Musselman. That's correct. And Newman says that Broxson threatened him, you should not speak about the special projects because things can happen to people, things can happen to their family, and their house can get burned down because it is easy to find out where someone lives. Why isn't that enough to make, to establish a genuine issue of fact on the tort of outrage? Your Honor, I believe if you look at the outrage cases, they are, they probably push much further than that. And I would, in fact, argue that if the Court had not dismissed this as a matter of law in the way that it did, looking at the best facts and the facts as Mr. Newman presented them, it would have also been appropriate to dismiss the outrage claim. Let's come back to this, because I really have the same concern Judge Kleinfeld mentions. The Court dismissed the outrage claim on reliance on Halbree, but apparently a Halbree decision that had been overruled by the Supreme Court. That's correct. So the trial court, Judge Martinez, never really addressed whether this alleged threat is sufficient under outrage. That's correct, Your Honor. Minimum, it seems to me, we would have to remand it for the district court to consider whether a summary judgment should be granted on that basis. No, Your Honor, you would not. Well, you're saying because as a matter of law it's not enough. That's correct. Okay, but now here's the statement in substance. Don't talk about special projects. Things can happen to people. Their houses can burn down, and we know where you live. What he actually says is – That sounds like gangster – sounds like a gangster talking. It might not be true, but that was the version of the facts presented. That's correct. And what's your argument that's not outrageous? It would be the Washington case law, Your Honor. First of all, Snyder v. Medical Services Corporation, which tells us that it has to be so outrageous in character or so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and unethical in power. If you view it like a mob enforcer talking to someone, which this isn't, but if you view it like a gangster threatening someone, their family can be injured, their houses can burn down, and especially we know where you live, why doesn't that go beyond those questions of degree? Isn't this a jury question as to whether it's atrocious? Your Honor, I don't believe it is. Traditionally in Washington under Rice v. Yanovich, in most cases, it's understood that the trial judge is the gatekeeper and that it is the trial judge that makes the initial decision about whether the behavior is outrageous. Wait. He can't do anything he wants, though. No, of course he can't. I've got a problem trying to make a decision based on the language of the restatement or the paraphrases of it in the Washington court, because the language is unusually indeterminate on outrage. I mean, one way it could be read is if the plaintiff's lawyer can get the jury mad enough. Right. It's hard to say what it means. So I like to look at the facts of the cases. Are you able to say, now the jury could decide, Broxson never said this to Newman, it's just flat out a lie. Of course. The jury could decide, I guess, that it didn't rise to the level of outrage in these circumstances. But I'm trying to figure out from the facts of the Washington cases where they say it is outrage sufficient to get to the jury or it isn't, how the facts here compare to the facts there. You may find Grimsby v. Sampson helpful, Your Honor. That's the original Washington case on outrage, which held that the tort of outrage does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. This is what I mean about the words being indeterminate. What were the facts? What were the facts? What he goes on to say is in this area, plaintiffs must necessarily be hardened to a certain degree of roughness. Can you talk about facts? On kindness and lack of consideration. What were the facts in that case? Pardon me, Your Honor. That's really what we're looking at. I do understand your point, Your Honor. Tell us what the facts were. She doesn't know. I guess I have a philosophical problem with the whole idea that we should be deciding if it's sufficient to go to a jury as opposed to tendering that issue back to the district court, which never considered it. That's correct. And if the district court decided it shouldn't go to the jury and wrote a little essay as to why, we as an appellate court can review that. But why should we be trying to decide that in the first instance? The district court decided on an incorrect premise of law. It did, Your Honor. So why shouldn't we ask the district court to decide the issue on a correct premise of law? Because, Your Honor. You want to argue, as you must argue for your client, that your client wants to win without a remand, but that's asking us to interpret this threat language as being, as a matter of law, insufficient. What you would be doing, Your Honor, is conducting a de novo review based upon the declaration of Bob Newman, those portions of it that were not stricken by the trial court, yes. Was that threat portion that we've all read to you stricken? No, Your Honor. I guess looking at it de novo, I'm still having a hard time comparing it to the facts of the Washington case, or cases, and saying it can't get to a jury. It's sort of hard to figure out the facts in Grimsby. I think what happened is the guy's wife died, and he says it was an outrage that the doctor abandoned her, but they talk a lot about the law, and I have not really plumbed the facts very well. You must have more facts than I do about that in the other cases. Why can't it get to the jury on comparing facts? Because, Your Honor, this actually fits tightly within the area of Mr. Newman necessarily should have been hardened to a certain degree of rough language, unkindness, and lack of consideration. He's an oiler on a vessel. If they called him a bad word, I could see that. Men not in the company of women often call each other bad words, sometimes joking, sometimes not. But that's not what this is. Look, the question is, if the guy is told, we can burn your house down and we know where you live, how can we say as a matter of law that would not be outrageous? It's not something, as I see it, that your typical rough-and-tumble person should be inured to ignore. But that seems to be your argument. Certainly the argument in Benson v. Sampson is that threats are to be excluded from the threat of outrage. Yes, sir. I don't understand how you get them in the same category. If one of my colleagues told me I was an idiot and was violating my oath of office and did not apply the Constitution, that would not be outrage because it would just be nasty words. But if they also told me they had a contact in an advocacy group and somebody that they had a contact with was going to kill me when I was getting out of my car at the airport, that would not be the same as telling me what an idiot I was. That would be a threat to my life. Different things, altogether different. So I don't see how the general language about how you have to be inured to people saying bad things to you applies. Although what you suggest, Your Honor, is that claims of outrage always go to the jury, and that is not true. I didn't say that. Are you saying that threats are categorically excluded from outrage? Yes, Your Honor. They are specifically excluded in Grimsby v. Samson. People v. Samson. Grimsby v. Samson, yes. Grimsby v. Samson. That was the one about the person's wife dies in the hospital. That's correct, Your Honor. It seems like at most it would be dicta anyway. And if you talk about threats, yeah, most threats are not outrageous. I'm going to write a dissent that makes you look like a fool. I'm going to take you outside and punch your lights out. Not very serious in most circumstances, but I'm arranging to have you killed. We know where you live. That seems distinct. I don't get why they all fit under the same rubric. Well, maybe we've exhausted it. Your Honor, may we talk a bit about the whistleblower litigation or the aspect of the litigation? There were six causes of action that went to trial, Your Honor. Three of the First Amendment allegations and three whistleblower allegations. The three whistleblower allegations were dismissed on directed verdict at the end of plaintiff's case. Specifically, the member of the auditor's, State Auditor's Office, Donald G. Johnson, testified, and he testified that in this case, in 2002, he was conducting an audit of travel payments. He received two comments from whistleblowers. The first one came in May of 2002, and that one was directed to the specific travel payments made to Chief Engineer William Tantum. That comment was anonymous, and no one in this case has claimed to have made that comment. There was a second witness, Witness B. He was not anonymous. He would have been sent a letter under the revised Code of Washington 4240-040 identifying him as a whistleblower. Although Mr. Johnson could not identify him in court. Mr. Johnson also testified that in 12 years of auditing the Washington State Ferries, he had never had a whistleblower complaint about special projects. Mr. Musselman testified he did not claim to be Witness B. He did not produce a letter indicating he was Witness B. He had no contact at all with the representative, Don Johnson, of the State Auditor's Office. Mr. Newman also testified he did not claim to be Witness B. And he, too, did not have the contact required under RCW 4240-020 subsection 8 to qualify as a whistleblower. Mr. Nichman, Mr. Broxson, and Mr. Allen were all called as witnesses for the plaintiff, and none of them testified to having a belief that either Mr. Newman or Mr. Musselman had had contact with the auditor, had reported anything to the auditor. At that point, at the close of the plaintiff's evidence, the trial court correctly determined that Mr. Musselman and Mr. Newman were not whistleblowers under RCW 4240-020 subsection 8. There was no comment at the trial court level about this question of rules. That argument actually appears in this Court for the first time. I think we're more interested, or at least I'm more interested, in the evidence that came in that last day of trial. So let me talk about that. Two exhibits were admitted, 141 and 142. Exhibit the test, as the Court knows, is that the trial court abused its discretion and that the error was prejudicial. First of all, the trial court did not abuse its discretion. Exhibit 141 and 142 both came in as business records. Sotomayor, which one was that, 141? That's 141. Okay. It came in as a business record. Mr. Nitchman identified it. He was the appropriate officer to do so. He had examined Mr. Musselman's files during his disciplinary hearings. He was the appointing authority for this division of the ferries. So it was appropriate. Identified it as what? What was 141? I believe he identified it as his accommodation file, Your Honor. No. A portion of his accommodation file. Should this have been produced to the other side under the interrogatories? Your Honor, I believe the response is correct, that the interrogatories were directed to the individual defendants. Washington State ferries were not a defendant, and there at no time were documents requested of the Washington State ferries other than many documents that were requested through public disclosure before the case was filed. Wouldn't Nitchman why wouldn't Nitchman have to have identified 141? Because it was not in his possession. The way the discovery requests were phrased, and the trial court did examine those other documents. Where is the discovery request in the excerpts? I'm not aware of the discovery request being in the excerpts. I think I'm only aware of the evaluation that the trial court did on the motion for the new trial. This was terribly prejudicial. No, Your Honor. I would disagree with you on the question of prejudice. At the point where the jury received this document, a great deal had happened in terms of testimony. Yes, but the actual decision was based on, yes, his rights were violated, but he would have been fired anyway. Isn't that right? You're talking about the jury's ultimate decision? Yeah. But I think the jury's ultimate decision, Your Honor, was based upon the fact that Mr. Musselman had spoken with a reporter, and that reporter had gone to speak with Mr. Nitchman. I think that's a different issue. Here, I think the argument is that before this document was entered before the court, the jury heard from Chief Hank Temsland, and Chief Temsland talked about Mr. Musselman appearing at his home in the middle of the night, calling 26 times, threatened to kill him in February of 2000. They had heard about the fact that he had pled guilty to telephone harassment. They had heard that he had been charged with discourtesy and threats of violence by the ferries. They had heard that he had entered into a last-chance agreement with the ferries and that they knew that at that point, long unrelated to the accommodation file, they knew this man had been charged with threats of violence by his own union. Then they heard the testimony from Chief Steve Hare about the final violent encounter. Why was this introduced at all? What was the purpose of it if it wasn't to show that he would have been fired anyway? I was not the trial lawyer in this case, Your Honor. I believe probably they were reaching closure in their case. But certainly there was more than sufficient evidence in the record to demonstrate that Mr. Musselman would have been fired under the last-chance agreement. Wait a minute. I thought that the weight of the argument you just gave was even though if it was the only thing showing that the Musselman is the sort of person he is, it might have been prejudicial, nevertheless, it wasn't, because there was much stronger evidence about his propensity for violent threats and harassing phone calls and so forth. I was actually arguing it was not prejudicial, Your Honor, or because. So where is that other evidence now? The other evidence? Yeah. Is it in the excerpts? Yes. It would be the testimony of Hank Sembland. And I can actually give you the references for all of them if you'd like, Your Honor. It's in the excerpts of record? It's not in the excerpts of record. It's in the transcript. Oh. I had asked you. These were directed verdicts on the whistleblower. This was a the evidentiary question is based upon the entire trial transcript, of course, since it was the 10-day trial. So I can give you the transcript. Okay. Who are the other individuals? So it was Hank Sembland. I believe you don't pronounce the S. His testimony, and he testified to being threatened by Mr. Musselman, threatened that Mr. Musselman would kill him, and the 26 telephone calls in the middle of the night. And that was the basis for the last chance agreement. They had testimony about the last chance agreement itself, and then they had the testimony from Chief Steve Hare. And all of those parties were neutral. They were not defendants. They were not in any way connected. They were individual people who had had encounters with Mr. Musselman. And all of that was in the trial testimony by the 10th day of trial. But you didn't attempt to put any of that in the excerpts of record? No, Your Honor, because you have the complete transcript. I guess you probably don't realize this. All three of us get the excerpts of record. The district court clerk has the transcript record. And we can get one. We can get it from the district court if we want, but there's only one of them. And so, Your Honor, I did refer to it at length, but it would have meant putting it in most of the whole transcript. I mean, and it's a 10-day, almost three-week trial. Well, if you're trying to show that something is not prejudicial, it's nice to have you show it. Pardon me, Your Honor. Certainly, the difficulty of showing something is not prejudicial requires looking at the preceding 10 days. And I'm sorry for that. I believe I have 34 seconds. Thank you, counsel. Thank you very much. That concludes the argument in Musselman v. Nitchman. We'll go on with Marable v. Nitchman.
judges: Fletcher, Kleinfeld, Gould